**STATE of Missouri, Respondent,**

v.

**Marquita BROWN, Appellant.**

**No. WD 35405.**

Missouri Court of Appeals,
Western District.

Feb. 5, 1985.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied April 2, 1985.

Bruce W. Simon, Simon & Simon, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before CLARK, P.J., and SOMERVILLE and KENNEDY, JJ.

CLARK, Presiding Judge.

Marquita Brown was charged and convicted of the offense of stealing more than $150.00 and she was sentenced to serve a term of three years. On this appeal, she contends the judgment should be reversed and she should be discharged, first because the evidence was insufficient to support the conviction and, second because documentary evidence obtained as a product of an unlawful search and seizure was admitted over appellant's objection. Affirmed.

Appellant's challenge to the sufficiency of the proof made against her and the nature of the case as one dependent on circumstantial evidence require a detailed recapitulation of the facts. In so doing, we cast the evidence in the light most favorable to the state. *State v. Brown*, 660 S.W.2d 694, 699 (Mo. banc 1983). So defined, the evidence was as follows.

Appellant was in the employ of the City of Kansas City and was engaged in the duties of head cashier in the water department. In April, 1982, City officials became alerted to the possibility of irregularities in the water department by reason of com-

plaints by customers who received delinquent account notices when in fact their bills had been paid. Preliminary inquiry to trace the cause of the complaints disclosed that documents were missing from the water department and an imbalance existed between recorded receipts and bank deposits. A detailed audit was then commenced.

Attention focused on the payment processing operation of the water department cashiers. The period of March 15 to March 26, 1982 was subjected to detailed audit and cash shortages ranging from $600.00 to $1243.95 were discovered on each of these dates. Randomly chosen also were the dates of August 21 and September 24, 1981. On August 21 the cash shortage was $690.30 and on September 24 the shortage was $611.51. The shortages were all in the account of the head cashier, a position occupied by appellant during the respective times.

Three cashiers were in the employ of the water department during the time in question, appellant in the position of head cashier and two assistant cashiers who worked under appellant's supervision. It was the responsibility of the cashiers to process water bill payments as received and to credit customer accounts accordingly. Appellant prepared the daily bank deposit of payments received, including those processed by her and by the two assistant cashiers. As to the latter, they would total their receipts, consisting of cash and checks, and give them to appellant who would verify the balances. Appellant would then combine those with receipts she had processed that day and place the deposit in a bank bag to be picked up by a messenger service.

As was noted above, the existence of discrepancies first came to the attention of supervising personnel in the water department because customers who had verified payment records complained of receiving delinquency notices. Centering on this problem, the audit disclosed substantial delays between the date on which a customer's payment was received and the date on which the account was credited with the payment. Some thirty-three accounts tabulated during the audit span of eleven days showed delays of three weeks or longer from payment clearance to account credit. According to the auditor, the combination of daily shortages and the delayed credit of large payment checks to customer accounts suggested that an embezzlement scheme known to the accounting profession as "lapping" was in progress.

In a lapping fraud, a cashier pilfers currency from payment receipts and covers the shortage by showing later payments made by other customers as credits to the pilfered accounts. This, in turn, creates a need to cover the misapplied credits and further pilferage accumulates. As more and more credits to accounts must be manipulated, the delay between the date a customer's payment is received and the date on which that account is satisfied lengthens. The use of this scheme was confirmed by the audit of the daily bank deposits during the test period. On each day, although the total deposit agreed with the record of total receipts for the day, the deposit was composed of a larger amount of checks and a smaller amount of cash than the validating tapes showed had cleared through the cashiers' windows.

In implementing a lapping scheme, it is necessary that the thief have access to substantial amounts of cash and also be able to arrange the credit of payments made by checks to cover the misappropriated cash. Here, only appellant had that opportunity. The assistant cashiers were allowed to maintain only a minimum cash drawer balance of $100.00 apart from such cash as came to them in account payments. Appellant, conversely, was permitted a cash balance of $5,000.00. Moreover, the assistant cashiers had no opportunity to manipulate check and cash payments because any diversion would have been immediately discovered, assuming no confederacy on the part of appellant, when appellant combined and verified the daily tallys in preparing the bank deposit. There was, however, no corresponding check to preclude appellant's manipulation.

Further evidence adverse to appellant included the following circumstances. Audit was made of receipts on July 24, 1981, a date selected because appellant was not at work that day. There was no cash shortage. Although appellant's salary was reflected in a bi-weekly paycheck of $319.00, regular cash deposits were made to her personal bank account in amounts from $200.00 to $500.00 as frequently as twice a week. Appellant consistently intruded upon work outside the cashier's office in an apparent effort to gain access to mail containing large payment checks for commercial water accounts. Despite express direction to stay away from the mail room, appellant persisted in opening mail marked by the envelope color as likely to contain sizable checks of as much as $50,000.00 or $60,000.00. Of the thirty-three delayed credits to customer accounts paid by check during the audit period, all bore validation stamps indicating they were processed by appellant.

The first customer complaint about a delayed or omitted credit for an account payment made by check, the ultimate result of which was the audit described above, was given to appellant for resolution. She failed to obtain or present any explanation. When presented with these complaints, which became so numerous they created a major problem in the office, appellant became very nervous and excited. When it appeared that the audit investigation was centering on her, appellant left work without notice or explanation and never returned.

■ In a circumstantial evidence case, the facts and circumstances relied on to prove the guilt of the accused must be inconsistent and irreconcilable with any reasonable hypothesis of innocence. *State v. Easley,* 662 S.W.2d 248, 250 (Mo. banc 1983). The circumstances need not be absolutely conclusive of guilt or demonstrate impossibility of innocence and the mere existence of other possible hypotheses is not enough. *State v. Mandina,* 675 S.W.2d 113, 114 (Mo.App.1984). It is not necessary that the state's proof exclude every hypothesis of innocence. *State v. Brown, supra.*

Appellant contends that the proof summarized above did no more than create a climate of suspicion based primarily on the testimony of the auditor who, in turn, relied on appellant's validation stamp impression as the key item of evidence. She points out that others had access to the stamp and could well have used her stamp to process the altered transactions. Appellant argues, in effect, that all of the cashiers being suspect, the evidence was not enough to convict her.

■ A review of the evidence is persuasive that the circumstantial evidence against appellant was not only sufficient but was overwhelming. Appellant was the only person with access to and control over the final tabulation of payment receipts, large sums of cash and the arrangement of the bank deposits essential to perpetration and concealment of the thefts. Her interest in the mail receipt of large checks was consistent with the need of the embezzler to cover cash diversions, but inconsistent with her work and the scope of her duty. When the scheme was in the process of disclosure, appellant became nervous and excited and, without notice or explanation, she left work and did not return. She regularly made substantial deposits of cash to her personal account in amounts grossly disproportionate to her earnings.

The proof was adequate to support the finding of guilt made by the trial court. The point asserting the contrary is without merit and supplies no ground of error.

In the second point, appellant argues that the trial court erred in admitting in evidence state's Exhibit 2 consisting of monthly statements of appellant's checking account with United Missouri Bank. The account was in the name of appellant and her husband and the period covered by the statements was January, 1980 to April, 1982. The significance of the statements to the state's case was their confirmation of substantial deposits to appellant's account month by month. For example, deposits shown on the April, 1982 statement were, in part: 3/18—$300.00; 3/18—$400.00; 3/22—$300.00; 3/24—$300.00; 4/2—$300.00; 4/5—$300.00.

Appellant moved to suppress the statements and objected to their introduction on the ground that the documents were private papers or business records immune from seizure by warrant under § 542.271, RSMo.1978.[1] The parties are in agreement that the state first acquired the records by grand jury subpoena duces tecum issued in the course of the grand jury's inquiry into the crime and that the subpoena and seizure were regular and proper. Appellant contends that the records were not, however, available to use in prosecution of the charge under the indictment returned by the grand jury because of the limitation of § 542.271.

The claim which appellant makes that the grand jury subpoena was used as a subterfuge to obtain the bank records for later prosecution rather than investigatory use rests entirely on the fact that the grand jury indictment was quashed and an information was substituted. The record shows no confirmation of any subterfuge from these facts. Instead, the record indicates the substitution of the indictment was a matter of agreement between counsel based on the contention by the defendant that only one continuing offense occurred. The indictment was in fourteen counts and defendant's motion was directed to and accomplished a reduction in the charge from fourteen counts to one. The point was debatable and is not suggestive of any bad faith or artifice employed by the state as a device to obtain the records.

What appellant seems to suggest is that, the state, already having the bank records in hand, was obligated to issue another subpoena for their production before they could be used in evidence. That argument, even assuming it to be valid procedurally, can avail the appellant only if she could resist a second order for production of the records made on the bank. This she could not do because the records are bank records, not hers.

▇▇▇▇ Records of a depositor's account maintained by a bank are business records of the bank, not of the bank depositor.

The depositor has no claim to the records based on ownership or possession and he therefore has no expectation of privacy associated with the records which is protected under the Fourth Amendment. *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). Appellant would have no standing to challenge a subpoena to the bank for production of records of her account because the matters to be seized are the property or possessions of a third party. *State v. Rellihan*, 662 S.W.2d 535, 542 (Mo.App.1983). It therefore follows that any opportunity appellant would otherwise have had to oppose production of the bank records had a second subpoena issued would have been unavailing because appellant lacks standing to raise the challenge. On like grounds, appellant is in no position to object to the use of the bank records in evidence merely because the state failed to pursue a second subpoena to acquire documents it already had legitimately obtained.

The judgment and sentence are affirmed.

All concur.

---

**1.** The statute has since been amended. *Laws of* *Mo.*1983 p. 916.