**STATE of Missouri, Respondent,**

v.

**Farrel Gene PRIDE, Appellant.**

**No. WD 54962.**

Missouri Court of Appeals, Western District.

June 30, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 31, 1999.

Application for Transfer Denied Oct. 26, 1999.

Ray E. Sousley, Ross, Eufinger & Sousley, Kansas City, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before Presiding Judge JAMES M. SMART, Judge FOREST W. HANNA and Judge LAURA DENVIR STITH.

LAURA DENVIR STITH, Judge.

The appellant, Farrel Gene Pride, appeals his convictions for two counts of forgery and his sentence to two consecutive four-year terms of imprisonment. Mr. Pride argues that his convictions should be set aside because the trial court erred: (1) in denying his motion for judgment of acquittal because of insufficient evidence of his criminal intent; (2) in entering judgment against him based on Counts I and II because the indictments on those counts were allegedly insufficient; (3) in entering judgment against him on Counts I and II because he was unable to prepare a defense and was prejudiced because the indictments allegedly mixed the elements of two separate offenses and did not charge him with the offense of forgery; (4) in submitting Instructions Nos. 6 and 8 to the jury because both instructions failed to submit all the elements of forgery; (5) in admitting into evidence a copy of a cashier's check which was allegedly unlawfully obtained by the State; (6) in admitting into evidence the testimony of Patty Wapshott in violation of the attorney-client privilege; (7) in denying a request for continuance based upon his religious beliefs; (8) in admitting testimony regarding other instances of alleged criminal conduct; and (9) in admitting testimony from a State's witness who testified pursuant to an agreement with the State that the State agreed not to prosecute him in exchange for his testimony. Finding no merit to any of the claims, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mr. Pride operated a company called Midwest Environmental Technologies (MET). In February 1997, Mr. Pride was being prosecuted on a charge of property damage in the first degree in Boone County, Missouri, for his alleged contamination of the City of Columbia's water treatment plant while his business, MET, was working on a contract project with the city. Mr. Pride was represented in this matter by an attorney, Milt Harper.

On February 10, 1997, Mr. Harper filed a pretrial motion to test the water treat-

ment plant's soil and to obtain water samples to be used in investigating possible contaminants. The motion was granted on the condition that the parties agree to the terms and conditions of the testing. One of the requirements was that Mr. Pride would provide the City of Columbia with proof of adequate insurance prior to the testing, which was scheduled for March 25, 1997. Mr. Pride agreed to have proof of commercial liability insurance for MET by March 21, 1997.

On March 21, 1997, Mr. Pride faxed a document to his attorney, Mr. Harper. James Kjar, an associate in Mr. Harper's office, received the fax. The fax included a cover sheet and a document which was a certificate of insurance. The certificate purported to be issued by Insurance Advisors of St. Louis (IASL), and contained effective dates of "5/27/95 through 5/27/96." Beneath these dates, however, was a type-written notation which stated, "Reinstated through 5/27/97." Mr. Kjar did not read the cover sheet that was faxed with the document, and instead took the copy of the insurance certificate to Mr. Harper, who instructed Mr. Kjar to take the certificate to the Boone County Prosecutor's Office. Mr. Pride testified he did not know the copy of the insurance certificate would be sent to the Prosecuting Attorney unaccompanied by the qualifying cover sheet, which Mr. Kjar did not read. Mr. Pride later produced a copy of a cover sheet which he claimed was the one originally faxed with the certificate of insurance. It stated, "Policy will be in effect Monday A.M. The [sic] have to give me an amount of money to wire Monday A.M."

On March 24, 1997, the day before the scheduled drilling, the Boone County Prosecutor turned the copy of the insurance policy over to the City of Columbia's Chief Engineer and Finance Department. Both departments were suspicious of the document and contacted IASL. Through IASL, Boone County learned that although IASL had covered MET with insurance on past occasions, their policy with MET expired in 1996 and had not been reinstated through March 27, 1997, as represented by the typed writing on the faxed document of insurance. Neither had they indicated they could not tell him until Monday how much money it would take to reinstate the policy. To the contrary, they had already told him the amount needed to reinstate the policy and he had not paid it or indicated he was going to do so.

When Mr. Harper was informed that the certificate of insurance might not be authentic, he telephoned a service representative with IASL in the presence of Mr. Pride. However, Mr. Pride asked the representative not to disclose any information regarding the insurance policy and later told the representative that he would overnight a check and fax a copy of it to IASL to get the policy issued. Mr. Pride faxed IASL a copy of a cashier's check issued by the State Bank of Hallsvillle, along with a memo that stated, "Will mail check tomorrow."

No cashier's check ever arrived at IASL, and an original of the purported cashier's check in IASL's name faxed to it was never located. An employee of Mr. Pride testified that the purported cashier's check faxed to IASL was actually an earlier check that Mr. Pride had written to a company called Extech in July 1995. The employee further testified that Mr. Pride had told him that the prior payee's name on the check, as well as the amount, had been whited-out with IASL and the new amount printed over the old Extech designations. This altered check was then faxed to IASL. No check arrived in the mail thereafter, as promised in the fax.

On March 25, 1997, the Boone County Prosecuting Attorney and an investigator in the Prosecutor's office arrived at the IASL offices and served a *subpoena duces tecum* upon Don Bratcher, an IASL agent, requesting the production of documents either then, or when Mr. Bratcher was called as a witness in Mr. Pride's prosecution. While at the IASL office, the Prosecutor found Mr. Pride's memorandum and

a copy of the cashier's check faxed by Mr. Pride, and seized them. The March 25, 1997 drilling to test the soil and get water samples for Mr. Pride's property damage suit never occurred.

On March 26, 1997, both Mr. Harper and Mr. Kjar were called as witnesses for the State in the property damage case and in a not-yet-filed forgery case. Mr. Harper withdrew as Mr. Pride's counsel because of the conflict of interest created. Mr. Pride hired a new attorney, Stan Clay, to represent him.

On March 28, 1997, Mr. Pride was served with a search warrant at his MET office in Sturgeon, Missouri. During the search, Mr. Pride called Mr. Harper's office, but Mr. Harper was not available. Mr. Pride nonetheless asked Mr. Harper's secretary/paralegal, Patty Wapshott, what crime it would be if he took some incriminating evidence during the search while no one was watching. Ms. Wapshott told him that she did not think anyone would tell him that it would be fine to take the item, but that she could not give him legal advice. She advised him to call his new attorney, Mr. Clay. There is no evidence that Mr. Pride actually took any incriminating evidence after this telephone call.

On May 1, 1997, Mr. Pride was charged by indictment with two counts of the Class C felony of forgery, in violation of Section 570.090.1(4), RSMo 1994. Count I alleged that Mr. Pride transferred a copy of the altered insurance certificate with the knowledge or belief it would be used as genuine, and Count II alleged that Mr. Pride transferred a copy of the altered check with the knowledge or belief it would be used as genuine.

The forgery trial began on July 24, 1997. Mr. Pride moved for judgment of acquittal at the close of the State's evidence and at the close of all the evidence, arguing that his conduct involved only future promises, which could not be the basis for a forgery conviction. The jury returned verdicts of guilty on both counts of forgery and the court sentenced Mr. Pride to two consecutive four-year sentences. Mr. Pride appeals.

## II. STANDARD OF REVIEW

We defer to the trier of fact when reviewing the sufficiency of the evidence supporting a criminal conviction. *State v. Grim*, 854 S.W.2d 403, 414 (Mo. banc 1993). Our standard of review is whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *Id.,citing, State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989). We view the evidence in the light most favorable to the prosecution. *Id.*

## III. SUFFICIENCY OF EVIDENCE OF FRAUD AS TO THE CERTIFICATE OF INSURANCE AND AS TO THE CASHIER'S CHECK

■ In his first point on appeal, Mr. Pride argues the trial court erred in denying his motion for judgment of acquittal because the evidence was allegedly uncontroverted that his conduct did not involve intent to defraud, as is required by Section 570.090.1(4), under which he was indicted. Rather, he said, his conduct solely involved promises regarding future events, rather than misrepresentations of existing facts, and, therefore, could not support a finding of the requisite fraudulent intent.

■ Forgery is a crime which may be committed in several ways. The essential elements of forgery include a showing of a false making or other alteration of an instrument or a writing, fraudulent intent, and that the instrument is so made or altered so as to be apparently capable of effecting fraud. *State v. Cockrell*, 858 S.W.2d 825 (Mo.App.1993). Intent to defraud, as an element of forgery, is a general intent and can be inferred from the act of forgery itself, if shown. *State v. Johnson*, 855 S.W.2d 470 (Mo.App.1993); *State v. Wakefield*, 682 S.W.2d 136 (Mo.App. 1984); *State v. Hogshooter*, 640 S.W.2d 202 (Mo.App.1982). An intent to defraud can

be inferred from transferring a document purported to have been made by another, when the transferor knows it was not made as purported. *Cockrell*, 858 S.W.2d at 827.

Here, regardless whether the documents Mr. Pride transferred pertained to future events, the actual writings and instruments were themselves altered documents which Mr. Pride knew contained misrepresentations at the time he transferred them. These instruments were also capable of effectuating fraud if they had been relied upon by the parties to whom Mr. Pride transferred the documents. The fact that neither the prosecutor's office nor IASL acted to their detriment on the basis of the false information contained in the certificate of insurance or the cashier's check does not negate Mr. Pride's fraudulent intent in sending the documents. Even though Mr. Pride testified he had no intent to commit fraud in sending either the altered cashier's check or the altered certificate of insurance, the jury had before it sufficient evidence from which it could infer that Mr. Pride had the intent to commit fraud because he sent both the cashier's check and the certificate of insurance knowing that both were altered and contained false information, and did so with the implied intent that they be relied on. Point I is denied.

## IV. PLAIN ERROR IN PROCEEDING UNDER INDICTMENTS, AND INSTRUCTING JURY IN CONFORMITY WITH INDICTMENTS, WHICH ALLEGEDLY IMPROPERLY MIXED THE ELEMENTS OF FORGERY UNDER § 570.090.1(3) AND (4) AND WERE UNDULY VAGUE

██ In his next three points, Mr. Pride challenges the validity of the language utilized in the indictments and jury instructions regarding forgery. He essentially alleges that the State erroneously combined elements of Sections 570.090.1(3) and (4) in the indictments and jury instruc-

tions, and, as a result, did not actually charge him with or convict him of either crime or with any actual offense punishable under Missouri law.

Section 570.090.1 establishes different offenses which constitute the crime of forgery. It states:

1. A person commits the crime of forgery if, *with the purpose to defraud,* he

(1) Makes, completes, alters or authenticates any writing so that it purports to have been made by another or at another time or place or in a numbered sequence other than was in fact the case or with different terms or by authority of one who did not give such authority; or

(2) Erases, obliterates or destroys any writing; or

(3) Makes or alters anything **other than a writing,** so that **it purports to have a genuineness,** antiquity, rarity, ownership or authorship **which it does not possess;** or

(4) Uses as genuine, or possesses for the purpose of using as genuine, **or transfers with the knowledge or belief that it will be used as genuine, any writing or other thing which the actor knows has been made or altered in a manner described in this section.**

§ 570.090.1 (emphasis added).

Mr. Pride was charged with two counts of forgery under Section 570.090.1(4) and his indictment was modeled after MACH 24.20.4, the pattern charge for the crime of "Forgery: Uttering as Genuine." That pattern charge permits use of the language "purports to have a genuineness" it does not possess in charging under subsection (4) of the statute for uttering a forged writing, even though that phrase is only specifically found in the offense of forgery described under subsection (3) of the statute involving items other than writings, and is not specifically restated in subsection (4). Following this pattern indictment

form, Mr. Pride's indictment set forth the following charges:

> **COUNT I:** The defendant, with the purpose to defraud, transferred with the knowledge or belief that it would be used as genuine, a copy of a certificate of insurance issued by Insurance Advisors of St. Louis, and at that time knew that this *writing* had been altered *so that it purported to have a genuineness which it did not possess,* and
>
> **COUNT II:** The defendant, with the purpose to defraud, transferred with the knowledge or belief that it would be used as genuine, a copy of a bankdraft, dated March 24, 1997, numbered 11356, made payable to Insurance Advisors, and at that time knew that this *writing* had been altered *so that it purported to have a genuineness which it did not possess.*

(emphasis added).

Mr. Pride, accordingly, now argues that his indictment was insufficient because the language used by the State in the indictment combined the elements of Section 570.090.1(4), *that the defendant transfer with knowledge or belief that the document would be used as genuine, a writing which he knows to be made or altered in a manner described in the statute,* with the elements of 570.090.1(3), which includes the language that the forger *makes or alters anything other than a writing so that it purports to have a genuineness ... which it does not possess.* Mr. Pride asserts that this combination of elements from subsections (3) and (4) created an indictment which failed to set forth the essential elements of the crime with which he was charged under subsection (4), because the indictment also contained language from a separate offense under subsection (3) only involving anything other than a writing, whereas his alleged crime involved only writings. He argues the indictment was thus insufficient because: (1) it thereby failed to charge an offense punishable under Missouri law; and (2) it

was so vague that it would preclude him from claiming double jeopardy if he were charged again following acquittal.

In support of his argument, Mr. Pride cites to *State v. Parks,* 969 S.W.2d 870 (Mo.App.1998), in which the Eastern District reversed a forgery conviction, holding that the inclusion of the "purports to have a genuineness" language of subsection (3) in an instruction under subsection (4), conflicted with the substantive law of the forgery statute by improperly mixing the two sections, and was erroneous. *Parks,* however, addresses the test for a challenge to the sufficiency of properly objected to jury instructions rather than the test for the sufficiency of an indictment, and, thus, is not dispositive here.

■ Instead, the test for the sufficiency of an indictment or information is "whether it contains all the essential elements of the offense as set out in the statute creating the offense." *State v. Hyler,* 861 S.W.2d 646, 649 (Mo.App.1993). To be sufficient, the indictment must also clearly advise the defendant of the facts constituting the offense so that he may prepare an adequate defense and prevent retrial on the same charges in case of an acquittal. *Id.* If a statute provides that a crime may be committed in several different ways or by differing means, the indictment must state the way in which it was committed. *State v. Murphy,* 787 S.W.2d 794, 796 (Mo.App.1990).

■ Where, as in this case, the charged party does not raise an issue concerning the validity of his indictment before or during the trial, but raises it for the first time on appeal, then review of the alleged error is far more limited than would otherwise be the case. The charged party must not only prove that there was an error in the indictment, but also:

> [T]hat (1) it does not by any reasonable construction charge the offense of which the defendant was convicted or (2) the substantial rights of the defendant to prepare a defense and plead former

jeopardy in the event of acquittal are prejudiced. In either event, a defendant will not be entitled to relief based on a post-verdict claim that the information or indictment is insufficient *unless the defendant demonstrates actual prejudice.*

*State v. Parkhurst,* 845 S.W.2d 31, 35 (Mo. banc 1992) (emphasis added). Therefore, we examine only for actual prejudice. Because we find no such prejudice, we need not address whether we would have read subsection (4) so narrowly as did *Parks,* or would instead have agreed with the drafters of the model indictment forms that subsection (4) was intended to allow indictment for transfer of a writing that purports to have a genuineness it does not have.

 A defendant suffers actual prejudice only if the indictment was so deficient that the defendant was not placed on notice as to what crime he was being charged with, or was so lacking in clarity that the defendant was unable to properly prepare a defense. State v. Briscoe, 847 S.W.2d 792 (Mo. banc 1993). Mr. Pride argues he was clearly prejudiced because the indictment failed to contain an essential element of the crime of forgery and failed to specify the manner or means in which he allegedly committed the forgery, and instead stated that he allegedly transferred a copy of a writing which "purported to have a genuineness which it did not possess." He conclusorily suggests that this hindered his defense and could preclude him from pleading double jeopardy should he later be indicted under Section 570.090.1(4).

We disagree. Mr. Pride has failed to identify any aspect of his defense that was in fact hindered by the variance of the indictment from the statute (assuming it does vary). Indeed, he did not even notice the alleged variance until after trial. Moreover, a review of the record reveals that his defense was based on lack of intent, and that it would have been no different had the indictment used the language set out in Section 570.090.1(1) or (2), rather than the slightly different language contained in Section 570.090.1(3). Finally, it is abundantly clear from the facts and the record exactly what activity was alleged to constitute forgery and exactly what section of the law was alleged to be violated – Section 570.090.1.(4). That was the section specifically cited in the indictment, and that is the section under which the case was submitted in the jury instructions. Mr. Pride could not again be prosecuted under that section. No double jeopardy concern arises. For these reasons, we find no plain error here.

 Mr. Pride next argues the court erred in submitting to the jury verdict-directing instructions based upon MAI–CR No. 324.20.4, because, like the indictments, the instructions improperly combined elements of subsections 570.090.1(4) and (3). Mr. Pride again relies on the holding in *Parks* as the basis for his challenge. In *Parks,* as noted, a forgery conviction was reversed because the MAI–CR instruction submitted by the trial court was found to conflict with the substantive law of the forgery statute in that it combined elements of two separate offenses. *Parks,* 969 S.W.2d 870.

Unlike in *Parks,* however, here Mr. Pride failed to raise an objection to the instructions at trial.[1] Thus, Mr. Pride acknowledges that this issue has not been properly preserved for appeal, and re-

---

1. Although the holding in *Parks* was based upon the same instruction utilized in the present case, the objection to the instructional error was timely raised in *Parks* during the instruction conference. Therefore, because the claim of error was preserved in *Parks,* it received more than plain error review. *Parks,* 969 S.W.2d at 873. Because of the different level of review in this case, the *Parks* analysis is not comparable to this situation. Thus, we need not address whether we agree with *Parks'* narrow interpretation of the scope of subsection (4) because, even if the approved jury instructions are not correct based on *Parks,* the only applicable issue here is whether the variance in the instructions, regardless of their validity, ultimately affected the outcome of the jury verdict.

quests that this court review the instructions for plain error. Under Rule 30.20, plain error review is mentioned only if the Court finds the error affected substantial rights, and plain error will result in reversal only if this Court finds it resulted in manifest injustice or a miscarriage of justice. In this context, Mr. Pride must establish that the judge so misdirected or failed to instruct the jury that it is apparent that the instructional error affected the jury's verdict. *State v. Brown*, 913 S.W.2d 919, 921 (Mo.App.1996); *State v. Doolittle*, 896 S.W.2d 27, 29 (Mo. banc 1995).

We find no plain error here. There was sufficient evidence before the jury that Mr. Pride possessed the documents, knew they had been altered, and transferred the documents despite his knowledge that they were false. Assuming use of the wording that Mr. Pride transferred either document while it "purported to have a genuineness that it did not possess" rather than that it had been altered "so it purported to have been made by another" was error, under these facts, the jury could not have been confused or misdirected, and we therefore decline to give plain error review.

## V. IMPROPER USE OF SUBPOENA DUCES TECUM

■ Mr. Pride challenges the basis for the admission of a copy of the cashier's check that he faxed to IASL by asserting the State improperly used a *subpoena duces tecum* served on Mr. Bratcher at the IASL office to unlawfully obtain possession of the copy.

■ A *subpoena duces tecum* may command the attendance of non-party witnesses at court proceedings, as well as command the person to whom it is directed to produce books, papers, documents, or other objects designated therein. Rule 26.02. This rule is not intended to be a rule of discovery, but is instead a means of enforcing the production of documents or objects at deposition or trial that are mate-

rial and relevant to trial issues. *State v. Engberg,* 377 S.W.2d 282 (Mo.1964).

Mr. Pride argues the prosecution improperly used the *subpoena duces tecum* as an illegal search warrant rather than as a means to produce evidence for trial. Mr. Pride cites to *State v. Ek,* 834 S.W.2d 828 (Mo.App.1992), which found a *subpoena duces tecum* was used improperly because it failed to give information as to the place, time, and date of the deposition to the party being served the subpoena and being ordered to produce documents. The court found that the lack of this information established that the prosecutor was not using the subpoena for the purpose of notifying the other party or the witnesses of the deposition, but instead as an improper *ex parte* discovery tool.

Here, however, contrary to Mr. Pride's argument, the prosecution did include the date, time, and location of the proceeding at which Mr. Bratcher could alternatively produce the documents, and the record is devoid of other evidence of bad faith in the prosecutor's use of the subpoena.

■ The State further points out that, even if the subpoena were being used improperly, Mr. Pride has no standing to challenge the seizure of the copy of the check because this copy was a record of IASL, not of Mr. Pride. To have standing to challenge the seizure of personal property by a government agent, the challenger must have a privacy right in the items seized. *State v. Brown,* 689 S.W.2d 63 (Mo.App.1985). Here, we agree Mr. Pride had no privacy rights in preventing recovery from a third party of a fax simply because he was the one who originally had sent the fax to the third party. Thus, he has no right to challenge the admission of the copy of the check obtained from the third party pursuant to the subpoena.

## VI. VIOLATION OF ATTORNEY-CLIENT PRIVILEGE

■ Mr. Pride challenges the admission of testimony given by Patty Wapshott,

a paralegal/secretary for his former attorney, Mr. Harper, regarding a telephone conversation she had with Mr. Pride after Mr. Harper had withdrawn as Mr. Pride's attorney and after Mr. Pride had already hired a new attorney to represent him.

 The attorney-client privilege extends to confidential communications between an attorney and his client (and, at times, employees of the attorney) regarding the representation of the client. *State v. Timmons*, 956 S.W.2d 277 (Mo.App. 1997). In order to invoke this privilege, the party asserting it must show: (1) the existence of an attorney-client relationship at the time of the interaction or communication, and (2) that an attorney-client relationship existed with regard to the subject matter of the communication or incident. *State v. Smith*, 979 S.W.2d 215 (Mo.App. 1998). If either of these factors is absent, the privilege does not apply.

Here, the court permitted Mr. Harper to withdraw as Mr. Pride's attorney on March 26, 1997, and Mr. Pride immediately hired a new attorney, Stan Clay, as his replacement. Two days later, on March 28, 1997, Mr. Pride's office was being searched by the police. Mr. Pride argues that he attempted to contact both Mr. Clay and Mr. Harper for advice during the search of his office, but was unsuccessful. Mr. Pride, however, did speak with Ms. Wapshott, Mr. Harper's paralegal/secretary, and claims that it is this conversation that is protected by the attorney-client privilege.

 Assuming, without deciding, that the attorney-client privilege would have extended to a conversation between Mr. Pride's attorney's secretary and himself in this context, at the time Mr. Pride spoke with Ms. Wapshott, he no longer had an attorney-client relationship with Ms. Wapshott's employer, Mr. Harper. Moreover, although there are limited circumstances in which courts have permitted the extension of the attorney-client privilege to conversations even though a formal attorney-client relationship does not exist, courts generally limit this to situations in which the defendant *reasonably believes* the attorney is representing him. *State v. Longo*, 789 S.W.2d 812, 816 (Mo.App.1990). Here, Mr. Pride knew his attorney-client relationship with Mr. Harper had ended, and indeed Mr. Pride already had hired a new attorney to represent him. Furthermore, during his conversation with Ms. Wapshott, she reminded him that Mr. Harper no longer represented him and that, if he needed advice, he was to contact his new attorney, Mr. Clay. Thus, there is absolutely no basis, on these facts, on which Mr. Pride could have reasonably believed Mr. Harper was still representing him in the matter. The attorney-client privilege, therefore, does not apply.

## VII. CONTINUANCE DUE TO RELIGIOUS BELIEFS OF DEFENDANT AND WITNESS

 Mr. Pride contends the trial court violated his right to the free exercise of his religion under both the First Amendment of the United States Constitution and Article I, Section 5 of the Constitution of the State of Missouri, by denying his request to adjourn the trial proceedings from Friday, July 25, 1997, to the following Monday, July 28, 1997, in order to accommodate his religious beliefs and practices.

 The First Amendment to the United States Constitution mandates that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ..." U.S. CONST. amend. I. This provision binds the states through the Due Process Clause of the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The Free Exercise Clause precludes all governmental regulations on beliefs, but the government may, under certain circumstances, impinge on a individual's actions in accordance with those beliefs in exercising the power to proscribe conduct. *See Employment Div., Dep't of Human Resources v. Smith*, 494

U.S. 872, 890, 110 S.Ct. 1595, 1606, 108 L.Ed.2d 876 (1990). The State of Missouri has a similar clause in Article I, Section 5, which provides:

> That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; that no human authority can control or interfere with the rights of conscience; that no person shall, on account of his religious persuasion or belief, be rendered ineligible to any public office or trust or profit in this state, be disqualified from testifying or serving as a juror, or be molested in his person or estate; but this section shall not be construed to excuse acts of licentiousness, nor to justify practices inconsistent with the good order, peace or safety of the state, or with the rights of others.

MO. CONST. Art. 1, § 5. The significance of the right to the free exercise of religion is not diminished by an individual's status as a defendant in a criminal proceeding. *U.S. v. Fisher,* 571 F.Supp. 1236 (S.D.N.Y. 1983).

Here, the court had been informed in a conference a few months prior to the trial (when Mr. Pride was represented by Mr. Harper) that Mr. Pride was a Seventh Day Adventist. At trial, Mr. Pride was represented by his new attorney, Mr. Clay. At the beginning of voir dire, the court informed the jury panel of the possibility that the trial would go into Saturday, but told the panel that the case should be "completed one way or the other by [Friday night], and if not by [Friday night], by sometime on Saturday." The court proceeded with voir dire and then recessed for jury selection. During the recess, while the jury was being selected, Mr. Pride pointed out to Mr. Clay that he was a Seventh Day Adventist and that he would have a problem if the trial were to be held on Saturday. After the recess, but before the jury was sworn in, Mr. Clay reminded the judge of Mr. Pride's religious belief that his Sabbath is from sundown Friday to sundown Saturday, and of the potential conflict with the trial schedule. The court stated he wished it had been brought to his attention that morning before he told the jury that the case may go on to Saturday, but delayed making a ruling until it became clear whether or not it might be possible to conclude trial by sundown Friday.

By Friday afternoon the court suspected the case would not be complete by sundown Friday. The court again expressed his disgust that no one had reminded him while he was talking to the jury panel about how long the case was going to take that someone might not be able to try this case on Saturday. Before the court ruled on the issue of holding court on Saturday, Mr. Pride took the stand and testified under oath about his religious beliefs. He testified that he was a Seventh Day Adventist and that his Sabbath was observed from sundown Friday until sundown Saturday. He also testified that his involvement in any secular activity during the Sabbath would violate his religious beliefs. He further stated that he believed his participation in the trial, if it were to be continued on Saturday, would be purely secular and against his moral conscience. He requested that, if the trial were not concluded by sundown Friday, the court not hold court Saturday so that he could observe his Sabbath.

When it became evident that trial would not be concluded by sundown Friday, the judge ultimately took up and denied the motion to adjourn the trial until the following Monday. In so ruling, he stated that in making his decision he weighed Defendant's desire not to hold trial on Saturday with: (1) the fact that Defendant failed to mention the potential conflict until after the jury had been selected, even though the potential for a Saturday trial was discussed earlier in the proceeding, and the court asked if there would be any conflicts, and (2) the fact the judge had a law day on Monday, bench trials set for Tuesday, and a jury trial on Wednesday of the following week, and so would have to put off the

trial even further or else delay those proceedings.

Mr. Pride states that the court's refusal to adjourn the trial until the following Monday essentially required Mr. Pride to make a Hobson's choice: he could either (1) follow his moral conscience and exercise the right to observe his Sabbath by staying home and avoiding the secular trial, or (2) appear in court on Saturday to exercise his right to be present at trial. Mr. Pride states he decided to appear in court on Saturday, in violation of his religious beliefs, because he thought it was necessary and vital to his defense that he be present at the trial in order to exercise his right to testify on his own behalf.

On appeal, Mr. Pride now argues that the requirement that he violate his beliefs by appearing at trial was constitutional error which entitles him to a new trial. In support, he cites principally to *People v. Gilliam*, 215 A.D.2d 401, 626 N.Y.S.2d 245 (1995). That case held that a trial court erred in forcing a Muslim minister to chose between attending trial on a Friday, his Sabbath day, or leading prison worship services. In so ruling, *Gilliam* applied a balancing test, requiring the state to show that it had a compelling state interest in holding court on Friday despite defendant's religious beliefs. The state was unable to show such an interest in that case. *Id.*

The balancing test used in *Gilliam* was consistent with that required by the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq.* (1993). That Act was, however, invalidated by the United States Supreme Court in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). In *Boerne*, the Supreme Court held that states need not show a compelling state interest in order to apply neutral, generally applicable laws to religious practices. *Id.* Thus, if a court reasonably exercises its discretion in applying such neutral laws, then it has not violated a defendant's First Amendment rights.[2]

Here, the judge carefully considered Defendant's concerns and determined to nonetheless hold court on Saturday because of Defendant's delay in raising this issue and because it was the only time he could hold court in light of other scheduled cases. While the judge could have reached a different conclusion—for instance, he could have determined to reset his schedule for the following week and to put off the trial scheduled for that week—we cannot hold that he abused his discretion in failing to do so.

 In addition, as to Mr. Pride's claim that the continuance prejudiced his defense because one of his witnesses, also a Seventh Day Adventist, failed to honor her subpoena and appear for trial on Saturday, we find that no prejudice resulted. The defendant proffered that he expected the witness, Ms. Schnell, to testify that while she was employed by MET, she made the typed memorandum notation on the certificate of insurance which states, "Reinstated through May 27, 1997" at the direction of David Rachell. This information, however, was essentially testified to by Mr. Rachell, another MET employee. Mr. Rachell testified that after he filled out an application for insurance through IASL, he had the secretary, Ms. Schnell, at his direction, type on the old certificate of insurance a statement that it was reinstated through May 27, 1997. Ms. Schnell's testimony would have been merely cumulative on this issue, and thus, unnecessary. Therefore, even if the trial court should have granted the continuance, Mr. Pride fails to demonstrate any preju-

---

**2.** Although Mr. Pride also brings a claim under the Missouri Constitution, the question of whether or not Missouri would adopt the United State Supreme Court's interpretation of the Free Exercise Clause in *Boerne* in interpreting the Missouri Constitution's free exercise provision, need not be decided today, as Mr. Pride has failed to discuss any difference in the Missouri and United States Constitutions in his brief.

dice from the denial of the continuation on this basis.

## VIII. EVIDENCE OF PRIOR FORGERIES

■ Mr. Pride argues the trial court erred in permitting a witness for the State to testify that on two prior occasions Mr. Pride had falsified insurance certificates that he provided to MET customers. Mr. Pride argues the testimony was inadmissible because there is no relationship between these two instances and the crimes charged and because the evidence was extremely prejudicial.

■ Evidence of uncharged crimes, wrongs, or acts is generally inadmissible for the purpose of showing the propensity of the defendant to commit such crimes. *State v. Morrow,* 968 S.W.2d 100, 107 (Mo. banc 1998). Evidence of other crimes or bad acts is admissible, however, if it is logically and legally relevant and tends to establish motive, intent, absence of mistake or accident, or a common plan or scheme. *Id.; State v. Bernard,* 849 S.W.2d 10, 13 (Mo. banc 1993). Evidence is logically relevant if it has some legitimate tendency to establish the accused's guilt of the charges for which he was on trial, such as when it tends to establish motive, intent, the absence of mistake, a common scheme or plan, or the identity of a person charged with the commission of the crime. *State v. Clover,* 924 S.W.2d 853 (Mo. banc 1996). Evidence is legally relevant if its probative value outweighs its prejudicial effect. *Id.*

In this case, Mr. Pride was charged with two counts of forgery, each requiring proof of a purpose to defraud. At trial, Mr. Pride argued that his acts of transferring copies of altered documents merely consisted of promises as to future events, and thus, lacked any purpose to defraud. He denied any intent to defraud and denied an intent to falsify insurance certificates in order to avoid purchasing liability insurance. Based on this defense, it cannot be said the evidence that Mr. Pride had previously falsified insurance certificates to avoid purchasing liability insurance was not logically relevant. Most basically, the evidence of separate falsified insurance certificates tends to prove that the forgery for which Mr. Pride was on trial was not a mistake, that Mr. Pride had a motive and actual intent to commit fraud in transferring these documents, and that these acts had some relationship to a general criminal enterprise in Mr. Pride's business. Thus, this evidence had a legitimate tendency to establish Mr. Pride's guilt of the crimes charged.

■ The evidence was also legally relevant. Legal relevance requires a balancing of the probative value of the evidence against its prejudicial effect on the jury. *Clover,* 924 S.W.2d at 856. This determination rests within the discretion of the trial judge, and the judge is afforded a great deal of deference in making such determination. *Id.* Considering the relevance of the fact that Mr. Pride denied any knowledge or intent that the documents he transferred might be relied upon, we cannot say that the court abused its discretion in admitting the evidence of the prior altered documents.

## IX. ERROR IN EXCLUDING TESTIMONY OF WITNESS PROMISED LENIENCY IN RETURN FOR TESTIMONY

■ Mr. Pride argues that a promise by the prosecutor that he would not prosecute a witness for the State, Edward Dean, for crimes in which he "acted in concert" with Mr. Pride, only if the witness implicated Mr. Pride, is void as against public policy. Without citing authority, Mr. Pride argues such agreements are void because the act of giving immunity to a witness, or entering into any agreement for favorable testimony, is tantamount to "buying" testimony. He argues that, if a defendant cannot engage in conduct of soliciting favorable testimony in exchange for something of value, then the State must

also be prohibited from such conduct. Mr. Pride further asserts the policy interest of the State in preventing perjured testimony is an additional reason to prohibit such agreements.

However, Mr. Pride failed to object to Mr. Dean's testimony at trial and the failure to timely object to the admissibility of evidence waives any right to challenge the admissibility of the evidence on appeal. *State v. Weston,* 926 S.W.2d 920 (Mo.App. 1996). In addition, the subsequent enactment of Section 491.205, RSMo Cum.Supp. 1997, which authorizes the granting of immunity to prosecution witnesses in criminal proceedings, undercuts Mr. Pride's public policy arguments. *See also, U.S. v. Singleton,* 165 F.3d 1297 (10 th Cir. en banc 1999), *cert. denied,* —— U.S. ——, 119 S.Ct. 2371, 144 L.Ed.2d 775, (court en banc rejected similar argument and found agreement with prosecutor was not against public policy). No cases are cited which support the result argued for by Mr. Pride, and we find no merit to the argument here.

For the reasons stated above, the judgment is affirmed.

Presiding Judge JAMES M. SMART and Judge FOREST W. HANNA, concur.